# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Kristen Rose,

                                             **Case No. C2-CV-04-1073**

                                             **JUDGE GREGORY L. FROST**

                **Plaintiff,**                 **MAGISTRATE JUDGE ABEL**

   **v.**

Broadspire Services, Inc.,
                    **Defendant.**

## OPINION & ORDER

In this ERISA action, Plaintiff Kristen Rose ("Rose") appeals Defendant Broadspire Services, Inc.'s ("Broadspire") denial of her application for long-term disability benefits. The parties have filed cross-motions for judgment on the administrative record, and briefing on those motions is now complete. (Docs. # # 16, 17, 19, 20, 21). For the reasons that follow, the Court **DENIES** Rose's motion (Doc. # 16) and **GRANTS** Broadspire's motion (Doc. # 17).

## BACKGROUND

### I.    TERMS OF PLAN

Rose is an Ohio resident who worked for Honda of America Manufacturing, Incorporated ("Honda") as a production associate. (Doc. # 1 at ¶ 1; Doc. # 16 at 1). As an employee, Rose was covered by Honda's long-term disability insurance plan ("plan") with Lumbermans Mutual Casualty Company ("Lumbermans"). (Doc. # 21 Ex. 1). While Broadspire administered claims under the plan pursuant to a contract with Honda, Lumbermans paid for all benefits provided for

1

under the plan.[1]  (Doc. # 1 at ¶ 3; Doc. # 11 at 1; Doc. # 18 at 1).

The plan stated "disability" and "disabled" meant that because of injury or sickness:

    1.    You [insured] cannot perform:
        a.    Each of the material duties of Your regular occupation; and
        b.    the duties of any position You are eligible for within Your job classification with the Employer [Honda] or the duties of a Reasonable Employment Option offered by the Employer; and
    2.    while unable to perform all of the material duties of Your regular occupation, You are:
        a.    performing at least one of the material duties of Your regular occupation or another occupation on a part-time or full-time basis; and
        b.    earning currently at least 20% less per month than Your Indexed Pre-disability Earnings due to that same injury or sickness; and
    3.    after benefits have been paid for 24 months, You cannot perform each of the material duties of any Gainful Occupation for which You are reasonably fitted by training, education, or experience.

(Doc. # 12 at 5).  The plan further provided:

The benefit will be paid when We [Lumbermans] have received proof that You [insured] are disabled due to injury or sickness and that You [insured] require the regular care and attendance of a Physician.  The benefit will be paid for the period of disability if You give Us [Lumbermans] proof that:
    1.    You continue to be disabled; and
    2.    You are under the regular care and attendance of a Physician.

*Id.* at 9.  The plan also elucidated on its requirements regarding notice and proof of the claim:

    1.    Notice
        a.    Notice of a claim must be given to Us [Lumbermans] within 30 days of the date disability starts, if that is possible.  If that is not possible, We must be notified as soon as it is reasonably possible to do so.
        b.    When We have received notice of claim, We will send You Our claim forms.  If the forms are not received within 15 days after you gave us notice of your claim, You can send Us written proof of claim without waiting for the form.

---

[1] Kemper National Services originally administered claims under Honda's disability plan. (Doc. # 18 at 1).  Broadspire assumed those responsibilities in late 2003.  *Id.*

    2.       Proof
        a.       Proof of claim must be given to Us.  This must be done no later than 90 days after the end of the Elimination Period.
        b.       If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible.  But proof of claim may not be given later than one year after the time proof is otherwise required.
        c.       Proof of continued disability and regular care by a Physician must be given to Us within 30 days of the request for the proof.
        d.       The proof must cover:
            i.       The date the disability started;
            ii.      The cause of the disability;
            iii.     any other documentation We reasonably believe is necessary to evaluate your claim.
    Payment of benefits is contingent upon Your providing proof of loss that We determine to be satisfactory.

*Id.* at 17-18.

## II.    ROSE'S INJURY & APPLICATIONS FOR DISABILITY BENEFITS

Rose injured her left shoulder while working on May 14, 2001 and she filed an incident report with Honda that same day.  (AR 0314).[2]  She visited Health Partners, Inc., Honda's health clinic, on May 17, 2001 where she was diagnosed with "left shoulder sprain, rotator cuff syndrome" by Dr. Fay ("Fay"), one of the clinic's doctors.  (AR 0317).  Fay did rule out "impingement syndrome."  *Id.*  Fay prescribed motrin and vicodin and scheduled her for a follow-up visit.  *Id.*  That visit took place on May 22, 2001.  Fay confirmed his earlier diagnosis but referred Rose to Dr. Stover ("Stover") for further evaluation.  (AR 0312).  Fay also ordered an MRI, which Rose had taken on May 24, 2001.  (Doc. # 278).  The MRI report stated Rose sustained a "suspicion of focal tears, superior glenoid labrum, left shoulder" but noted "No other abnormalities identified."  *Id.*

Stover performed arthroscopic surgery on Rose on August 27, 2001. (AR 0239-240).

---

[2] "AR" designates Administrative Record.

After the operation, Stover diagnosed Rose with "mild anterior instability of the left shoulder with labral tear and rotator cuff tendonitis." *Id*. After surgery, Rose completed physical therapy but continued to experience pain in her shoulder. (AR 0181). Stover approved her return to work on January 4, 2002 under Honda's work recovery program. (AR 0216, 0220). That program gradually increased Rose's hours and responsibilities to give her shoulder time to heal. *Id*. Because Rose continued to complain of shoulder pain, Stover ordered Rose off of work on February 28, 2002. (AR 0181).

Rose had another MRI on May 14, 2002. *Id*. The MRI revealed a "slight degree of impingement upon the surpaspinatus muscle" but "no rotator cuff or other focal abnormality was seen." (AR 0191). Apparently, Rose's shoulder failed to improve because Stover conducted a second arthroscopic surgery on Rose on October 16, 2002. (AR 0181). Stover's post-operative diagnosis was "recurrent impingement syndrome, left shoulder, secondary to anterior and inferior instability." (AR 172). Rose completed another round of physical therapy after the operation. (AR 0166-169).

On March 11, 2003, Rose completed a physical work performance evaluation at Honda's health clinic. (AR 0140). Specifically, the test consisted of twelve (12) tasks that tested Rose's dynamic strength, position tolerance, and fine motor skills. *Id*. Rose completed all of the tasks without stopping because of pain. *Id*. The physical therapist who administered the test concluded "it appears that some of the job demands may be beyond the client's current safe maximal abilities. Specifically, pushing, leaning/WB on the L. UE and gripping demands of the L. hand may be beyond her current work abilities." *Id*. at 0142. The therapist recommended that Rose: (1) return to work with restrictions; (2) minimize or avoid reaching above shoulder level and twisting her shoulder; (3) continue physical therapy, and (4) explore opportunities for

4

transitional work.  *Id.*

Rose returned to Stover with the results of the evaluation.  Stover then recommended that Rose avoid any work activity at shoulder level or above 80 degrees.  (AR 0020, 0092, 0094, 0132, 193).  Accordingly, Rose returned to work through Honda's modified work program which allowed her to work without using her shoulders to push or pull, two activities that aggravated her condition. (AR 0436).  She participated in that program from May 9, 2003 to May 23, 2003 before beginning a second round of physical therapy on June 10, 2003.  *Id.*

Approximately one month later, Rose began a third round of physical therapy.  (AR 0095).  The physical therapist noted no change in Rose's shoulder after the therapy and suggested that if Rose returned to work, she should do so with restrictions–namely, not using her left shoulder to reach overhead or to reach in front of her body.  *Id.*

After Rose completed her physical therapy, she returned to Stover's office for an examination on September 2, 2003.  (AR 0097).  Stover's notes from that visit indicate that Rose complained of continuing pain in her shoulder, usually about a five (5) to six (6) on a scale of ten (10).  *Id.*  Stover's notes further provide:

> I examined [Rose's] left shoulder today.  She has excellent motion in all planes.  She has a negative sulcus sign.  She does complain of some pain with load/shift.  She complains of pain with impingement maneuver and Hawkins sign.  She is tender along the superior border of the scapula and medial border of the scapula and overlying the rotator cuff anteriorly beneath the anterior acromion.  There are no signs of bicipital tenosynovitis.  O'Brien's test is negative. . . .  Kristen is not able to return to work without significant restrictions which have been written.  I think it would be in her best interest over the long term to avoid factory work in the future and undergo retraining for a less stressful occupation.  She will discuss options with Honda and her attorney.

*Id.*

On September 23, 2003, Stover's office notified Honda that there was no "current

treatment and vocational assistance recommended" for Rose.  (AR 0383).  That same day, Broadspire sent Rose a letter suggesting that she begin the process of filing a claim for long term disability benefits.[3]  (AR 0046-0048).  Rose had filed applications for temporary total disability under Honda's workers compensation insurance plan for the time period of June 7, 2001 until December 9, 2003.  (Doc. # 16 at 5).  As a result of Stover's contact with Honda, Rose received a letter around September 25, 2003 indicating that because she had reached maximum medical improvement, her "temporary total" benefits under Honda's workers compensation program were terminated as of September 23, 2003.  (AR 0099; Doc. # 16 Ex. A).  In other words, Honda granted Rose's applications for temporary total disability benefits from June 7, 2001 until September 23, 2003 when Honda terminated her award.  (AR 0382).

On September 29, 2003, Rose applied for long term disability benefits.  (AR 0016-0020). She based her application on left shoulder impingement syndrome and wrote that she was unable to work due to "restrictions from [Stover] for no pushing/pulling with both shoulders / no higher than 80 degrees."  *Id.* at 16.  Broadspire forwarded Rose's entire medical file, which included Stover's records on Rose as well as records from her workers compensation claim, to Dr. Blumberg ("Blumberg") for an independent peer review.  (AR 0051; Doc. # 16 at 8).  Blumberg specialized in orthopedic surgery.  (AR 0051).

The peer review form stated that Rose was a production associate and provided that her position required her to exert a medium level of physical exertion.  *Id.*  Blumberg reviewed the materials and concluded:

> [Rose] is a 33 year-old Honda production associate, which
> is a medium duty position.  Her diagnosis is left shoulder
> impingement.  She has been out of work since May 12, 2003.  The

---

[3] Broadspire had sent Rose a similar letter on February 21, 2003.  (AR 0043-0045).

6

only examination of the claimant in the records provided is that of Stover of 9/2/03.  He states that under physical examination in the left shoulder she has excellent motion in all planes.  She had a negative sulcus sign.  She does complain of pain with load/shift. She complains of pain with impingement maneuver and Hawkins sign.  She is tender along the border of the medial scapula.  There are no signs of bicipital tendonitis.  O'Brien's test is negative.  No range of motion testing, motor strength testing or neurologic examination is provided.  No objective testing, such as MRI studies, EMG, nerve conduction studies or x-rays are provided. Based on objective documentation, the records fail to support a functional impairment that precludes work at the medium level. Additional documentation which may support the claimant's disability status would be a current complete physical examination with range of motion testing, motor strength testing and neurologic examination, and/or objective testing to document pathology in the left shoulder.  The opinions rendered above reflect reasonable clinical certainty based upon the available information.

*Id.* at 51-52.

Broadspire sent Rose a letter on December 3, 2003 informing her that her application for long term disability benefits had been denied because:

based upon the medical documentation provided, there are insufficient updated quantitative physical findings and diagnostics to support a functional impairment that would preclude you from returning to your work as a production associate for Honda, which is a medium work category.

(AR 0054-56).  The letter stated that Rose may appeal the decision, and indicated that the following materials would be helpful for reconsideration of her application: (1) MRI; (2) nerve conduction studies; (3) EMG; (4) x-rays; (5) range of motion testing; (6) motor strength testing; and (7) a neurologic examination.  *Id.*

Rose appealed the denial.  She attached her entire medical file enclosed additional medical records for consideration in support of her appeal. (AR 0087; Doc. # 16 at 9).  Included in the supplemental materials was a letter from Randy Moore ("Moore"), Honda's placement leader, to Rose stating that Honda could not accommodate her medical restrictions.  (AR 0088).

7

In addition, Rose provided Stover's records from Rose's May 8, 2003, September 2, 2003, and December 2, 2003 office visits.  (AR 0089, 0090, 0091).  Rose further enclosed work capacity forms from May 8, 2003 to September 9, 2003; September 9, 2003 to December 9, 2003; and December 9, 2003 to March 9, 2004.  (AR 0092-0094, 0098).  Rose also included physical therapy reports from June 10, 2003 and July 17, 2003.  (AR 0095-0096).

Broadspire referred Rose's entire file to Dr. Ennis ("Ennis"), an orthopedic surgeon, for an independent peer review.  (AR 0552-554).  Ennis reviewed Rose's entire file and concluded that she was capable of working at a medium work level with restrictions.  (AR 0554).  Ennis noted, however, that if Rose's "job activities require overhead work . . . [Rose] is not capable of returning to those activities beyond 11/8/03."  *Id.*

Subsequently, Honda provided Broadspire and Ennis with a copy of Rose's job description.  (AR 0327-0328).  Ennis reviewed the description and then amended his previous report.  Specifically, the amended report stated:

> The previously dictated report dated 2/3/04 indicates that [Rose] was able to return to medium work activities, however she had restrictions of doing overhead lifting and overhead pushing, pulling and carrying.  A review of a recently evaluated job description which was supplied by [Rose's] employer today, indicates that [Rose's] medium level job does not require her to do any overhead lifting, pulling, carrying or pushing.  That being the case, there is no reason why [Rose] should not be able to return to her regular medium work level activities at the current time from 11/8/03 onwards.  The opinions rendered above reflect reasonable clinical certainty based upon the available information.

*Id.* at 0556-0557.

Thereafter, Broadspire's Appeal Review Committee ("appeal committee") reviewed Rose's entire file, including the reports of Blumberg and Ennis.  (AR 0323, 0325-0326).  The appeal committee upheld the original denial of benefits because:

> there was insufficient medical information (i.e. significantly abnormal

> diagnostic testing, medical evidence indicating your inability to perform your work related duties, any pertinent medical documentation your physician(s) feel preclude you from performing work, etc. supporting your inability to perform each of the material duties of your own occupation.

(AR 0320-0321).  The letter informed Rose that she had exhausted her mandatory appeals under the plan and noted that Rose had a right to file a civil action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

Rose utilized that right by filing the instant action on November 8, 2004.  (Doc. # 1). Rose's Complaint alleges that Broadspire violated 29 U.S.C. § 1132(a)(1)(B) of ERISA by denying her application for long-term disability benefits. *Id.*

Both parties have filed motions for judgment on the administrative record. *See Wilkins v. Baptist Healthcare System, Inc*., 150 F.3d 609, 619 (6th Cir. 1998) (holding "summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.").  The Court now turns to addressing the proper standard of review .

## STANDARD OF REVIEW

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 505-506 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).   If the plan provides the administrator with discretion then "the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998).   However, "the arbitrary and capricious ... standard does not require [the Court] merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.*, 385

F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  Under the arbitrary and capricious standard, a plan administrator's decision will not be deemed arbitrary and capricious so long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome."  *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (noting that "the arbitrary and capricious standard is the least demanding form of judicial review").  The Court must "review the quantity and quality of the medical evidence and the opinions on both sides of the issues."  *Jones*, 385 F.3d at 661.  In other words, a court will uphold a benefit determination if it is "rational in light of the plan's provisions."  *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th  Cir. 1996).

The Sixth Circuit does not require a plan to use certain magic words to create discretionary authority for a plan administrator in administering the plan.  *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 at n.2 (6th  Cir. 1992).  Yet the Sixth Circuit does insist upon "a clear grant of discretion [to the administrator]" before replacing *de novo* review with the arbitrary and capricious standard.  *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994).

In the case *sub judice*, the policy at issue requires insureds to complete a claim form and submit proof of the asserted disability to Broadspire, the plan administrator.  (Doc. # 11 at p. 9, 17, 18; Doc. # 12).  The plan provides "payment of benefits is contingent on Your [insured] providing proof of loss that We determine to be satisfactory."  (Doc. # 11 at 18).  Clearly, then, the plan gives Broadspire discretion and the Court agrees with the parties that the arbitrary and capricious standard of review applies to the instant matter.  (Doc. # 18 at 5-6; Doc. # 16 at 12).

The Court is required to consider only the facts known to the plan administrator at the

time the final decision was made to deny long-term disability benefits.  *Moon v. Unum Provident Corp*., 405 F.3d 373, 378 (6th Cir. 2005); *see also Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).  In this case, that date is February 13, 2004.  *Moon*, 405 F.3d at 379; (AR 0320-321).

## DISCUSSION

Rose asserts six arguments in support of her contention that Broadspire's denial of her application was arbitrary and capricious.  First, Rose posits that Blumberg selectively reviewed Rose's records when conducting his peer review.  (Doc. # 16 at 14).  Second, Rose argues that Broadspire arbitrarily and capriciously decided to provide Ennis with a generic job description when Ennis completed his review of Rose's application.  *Id.* at 16.  Third, Rose maintains that Broadspire failed to satisfy the plan's requirement that Broadspire consider whether Rose was eligible for alternative employment options at Honda.  *Id.* at 21.  Fourth, Rose argues that Broadspire acted arbitrarily and capriciously by concluding that there was insufficient medical information to support a finding that Rose was disabled under the plan.  *Id.* at 23.  Fifth, Rose contends that Broadspire should have considered Honda's payment of Rose's temporary total disability claims under Honda's workers compensation insurance.  *Id.* at 24.  Lastly, Rose suggests that Broadshire is both the payor and the administrator of the plan.  Thus, according to Rose, the Court must keep that conflict in mind when determining whether Broadspire's actions were arbitrary and capricious.  *Id.* at 25.   In response, Broadspire asserts that its actions were not arbitrary and capricious and that no such conflict exists.  (Docs. # # 17, 18, 19, 21).

## I.      JURISDICTION & STATUTORY LANGUAGE

The basis for Rose's claim is 29 USCS § 1132(a)(1)(B).  (Doc. # 1).  That section

provides:

> (a) Persons empowered to bring a civil action. A civil action may be brought--
> (1) by a participant or beneficiary--
> (A) for the relief provided for in subsection (c) of this section, or
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...

Therefore, the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.     NO CONFLICT EXISTS.

The Court must consider Rose's conflict argument first, as consideration and determination of that argument will permeate the Court's analysis of her remaining assertions. (Doc. # 16 at 13, 25).   Specifically, Rose suggests that Broadspire operates both as a decision-maker and payor of disability benefits under the plan.  *Id.*  If that is the case, then Court must consider that fact when determining whether the decision to deny benefits is arbitrary and capricious.  *Bruch*, 489 U.S. at 115; *see also Gillian v. Health Source Provident Adm'rs, Inc*., 152 F.3d 514, 521 (6th Cir. 1998).

The plan itself provides "Lumbermans Mutual Casualty Company will pay the benefits provided in the group long term disability insurance policy."  (Doc. # 21 Ex. 1).  Broadspire administers the claims.  (AR 320).  Consequently, the Court concludes that no conflict exists.

## III.    BROADSPIRE'S DECISION TO RELY ON BLUMBERG'S PEER REVIEW WAS ARBITRARY AND CAPRICIOUS.

As noted above, Blumberg reviewed Rose's medical records from Stover as well as records from her worker's compensation claim.  (AR 0051).  Blumberg concluded that those materials failed to support a "functional impairment that preclud[ed] work at the medium level."

12

In so concluding, Blumberg stated that the "only examination of the claimant in the records provided is that of Dr. Stover of 9/2/03." (AR 0052).

Rose seizes on that statement to argue that her file did include numerous records of office examinations, so Blumberg either intentionally failed to consider those reports or Broadspire did not provide him with Rose's entire claim file. (Doc. # 16 at 14-15). In other words, Rose asserts that Blumberg selectively interpreted Rose's medical records when he completed his peer review. (Doc. # 16 at 14-16). Thus, Rose concludes that Broadspire acted arbitrarily and capriciously when it decided to deny Rose's application based on Blumberg's peer review. *Id.* Broadspire counters that Blumberg did not "cherry pick" Rose's medical records and that its decision to rely on Blumberg's report was neither arbitrary nor capricious. (Doc. # 21 at 2).

Broadspire indicates that Blumberg "received" all of Stover's medical records. (Doc. # 21 at 2; AR 0051). Blumberg's peer review indicates otherwise. Specifically, Blumberg's review states "the only examination of the claimant in the records provided is that of Dr. Stover of 9/2/03." (AR 0052). To the contrary, Broadspire provided Blumberg with Stover's records of Rose's office visits on May 8, 2003, April 8, 2003, February 11, 2003, October 4, 2002, May 16, 2002, March 21, 2002 and February 28, 2002. (AR 0585, 0618, 0633, 0668, 0686, 0701, 0704). In addition to other materials, Rose's file also contained work release forms that Stover had completed for Rose from December 17, 2002 to May 23, 2003. (AR 0654, 0652, 0646, 0640, 0621, 0609).

Blumberg's own words establish that he only considered Stover's record from September 2, 2003 and that he ignored, or did not receive, Stover's other examination records on Rose. (AR 0052). Had he done so, Blumberg would have seen that Rose continued to suffer shoulder

13

pain and require intensive physical therapy. Futhermore, Stover's notes indicated that he had placed work restrictions on Rose. Moreover, Broadspire could have had Blumberg examine Rose but Broadspire elected not to do so, for whatever reason. "Whether a doctor has physically examined the claimant is indeed one factor that [courts] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish*, 419 F.3d at 508. Blumberg's review was therefore not based on the entirety of the evidence available to him and was not reasonable. Lastly, because Rose submitted all of her documentation supporting her claim for long-term disability benefits to Broadspire as the plan administrator, Broadspire had to have been aware that Rose's file contained more than one of Stover's records of examining Rose. Thus, Broadspire's decision to rely on Blumberg's peer review when deciding to deny Rose's application was arbitrary and capricious. *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).

Consequently, the Court must now determine whether there are any alternative grounds that adequately support Broadspire's decision to deny benefits to Rose. *Kalish*, 419 F.3d at 507.

## IV. HONDA PROVIDED ENNIS WITH ROSE'S JOB DESCRIPTION.

Rose does not assert that Broadspire's decision to rely on Ennis' review was arbitrary and capricious. Rather, Rose maintains that Broadspire's decision to supply Ennis with a generic job description that did not accurately reflect her job activities was arbitrary and capricious. (Doc. # 16 at 16-20; Doc. # 20 at 4). Broadspire correctly responds that Honda, Rose's employer, provided Ennis with the job description at issue. (Doc. # 16 at 18; Doc. # 18 at 4; Doc. # 21 at 6-7).

Ennis initially concluded that if Rose's "job activities require overhead work, it is my

14

orthopedic opinion that [Rose] is not capable of returning to those activities beyond 11/8/03."
(AR 552-555).  However, after Ennis completed his initial review he received Rose's job
description.  Ennis then filed an addendum to his initial report that stated "a review of a recently
evaluated job description which was supplied by the claimant's employer today, indicates that
[Rose's] medium level job does not require her to do any overhead lifting, pulling, carrying, or
pushing.  That being the case, there is no reason why [Rose] should not be able to return to her
regular medium level work activities at the current time from 11/8/03 onwards."  (AR 0556-
557).

The record establishes that *Honda* supplied Broadspire with the job description. (AR
0327-0328; 0556-0557).  That description, which is part of the administrative record, does not
indicate that Rose's position requires her to do any overhead lifting, pulling, carrying, or
pushing.  Thus, the Court concludes that Broadspire did not arbitrarily and capriciously supply
Ennis with a "generic" job description. (Doc. # 16 at 16).

Alternatively, Rose asserts that the record showed that her job required overhead work.
*Id.* at 18.  Rose points to the incident report she filed the day of her shoulder injury that states
that she was reaching up and pushing when she felt pain in her left shoulder.  (AR 0314,  0316).
But, because Honda provided Broadspire with the job description, and Broadspire forwarded it
to Ennis, neither Broadspire nor Ennis had a duty to search the record to find information to
contradict the information Rose's own employer provided them with.  In addition, Rose does not
assert that the description is incorrect; rather, her gripe is that it is "generic."  Rose could have
elected to supplement her appellate materials with a description she felt was reasonable, but she
did not do so.  Thus, Ennis' reliance on the job description Honda provided was entirely proper.
By extension, then, Broadspire's reliance on Ennis' review when determining whether to grant

15

Rose's benefits application was not arbitrary and capricious.

## V.   BROADSPIRE DID CONSIDER WHETHER ROSE WAS ELIGIBLE FOR ALTERNATIVE POSITIONS AT HONDA.

Rose contends that Broadspire failed to satisfy the plan's requirement to consider whether Rose was eligible for alternative employment options at Honda.  (Doc. # 16 at 21). Broadspire asserts that the plan required it to examine Rose's file to determine if she was disabled under the plan; thus, Broadspire contends that it was not required to consider Honda's efforts to find Rose a different job within the company.  (Doc. # 21 at 7).

As noted above, the plan defined disabled or disability as:

1.   You [insured] cannot perform:
   a.   Each of the material duties of Your regular occupation; and
   b.   the duties of any position You are eligible for within Your job classification with the Employer or the duties of a Reasonable Employment Option offered by the Employer; and

2.   while unable to perform all of the material duties of Your regular occupation, You are:
   a.   performing at least one of the material duties of Your regular occupation or another occupation on a part-time or full-time basis; and
   b.   earning currently at least 20% less per month than Your Indexed Pre-disability Earnings due to that same injury or sickness; and

3.   after benefits have been paid for 24 months, You cannot perform each of the material duties of any Gainful Occupation for which You are reasonably fitted by training, education, or experience.

(Doc. # 11 at 5).  Moore sent Rose a letter on December 19, 2003 indicating that Honda could not accommodate Rose's current work restrictions.  (AR 0088).

Contrary to Rose's assertion, Ennis, Broadspire, and the appeal committee did consider Honda's declaration that it was unable to place her in another position within the company

16

because of her restrictions.  (AR 320-321; AR 0088).   Ennis' February 3, 2004 peer review

indicated that he considered Moore's letter.  (AR 0552-0553).  Broadspire's February 13, 2004

letter to Rose specifically mentioned Moore's letter among the documents that were included in

Broadspire's review of Rose's application.  *Id.*  Thus, Rose's argument is without merit and

Broadspire did not act arbitrarily and capriciously.

## VI.      BROADSPIRE DID CONSIDER ROSE'S AWARD OF TEMPORARY TOTAL DISABILITY COMPENSATION UNDER HER WORKERS COMPENSATION CLAIM.

Rose contends that Broadspire acted arbitrarily and capriciously by failing to consider the

fact that she received temporary total disability benefits through Honda's workers compensation

program from June 7, 2001 to September 23, 2003.  (Doc. # 16 at 24-26 & Ex. A; AR 0099).

However, Blumberg, Ennis, and the appeal review committee did review Rose's workers

compensation information.  (AR 0051, 0320-0321, 0553).  Accordingly, the Court concludes that

Broadspire did consider Rose's workers compensation benefits and finds Rose's argument to be

unconvincing.

## VII.     BROADSPIRE DID NOT ACT ARBITRARILY AND CAPRICIOUSLY BY CONCLUDING THAT THERE WAS INSUFFICIENT MEDICAL INFORMATION SUPPORTING ROSE'S INABILITY TO PERFORM EACH OF THE MATERIAL DUTIES OF HER REGULAR OCCUPATION.

Lastly, Rose contends that Broadspire's ultimate decision to terminate her benefits was

arbitrary and capricious.  (Doc. # 16 at 23-24).  Broadspire maintains that its actions were not so

characterized because its decision was based on two independent peer reviews as well as a

review by the appeals committee, which included another physician.  (Doc. # 21 at 2-6; Doc. # 17 at 5-8).

Rose's essential argument is that the records she provided to Broadspire were sufficient to support a determination that she was disabled under the plan.  (Doc. # 16 at 24).  Stover's notes from Rose's September 2, 2003 office visit were included in those records.  Those notes indicated Stover's opinion that "[Rose] is not able to return to work without significant restrictions which have been written.  I think it would be in her best interest over the long term to avoid factory work in the future and undergo retraining for a less stressful occupation." (AR 0097).  Interestingly, Stover did not conclude that Rose was precluded from working or that she was totally disabled.  Rather, Stover noted that Rose would need "significant restrictions" and suggested that Rose find a "less stressful" job, not a less physically demanding job.

Blumberg, Ennis, and the appeal committee reviewed the records Rose provided to Broadspire.  They, like Stover, concluded that Rose's injuries did not preclude her from working at Honda as long as restrictions were in place.  In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), the United States Supreme Court established that plan administrators need not "accord special deference to the opinions of treating physicians.  Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."  *Id.* at 831.  The Court continued:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 834.  In other words:

> when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

*McDonald*, 347 F.3d 161, 169 (6th Cir. 2003).

Blumberg's review indicated that Rose had failed to provide range of motion, motor strength, neurologic, and objective testing.  (AR 0051-0052).  Blumberg then based his review on Stover's September 2, 2003 office notes.  Those notes indicated that Rose had "Excellent motion in all planes . . . she had a negative sulcus sign . . . she does complain of pain with load/shift O'Brien's test is negative."  *Id.*  In that same review, however, Blumberg erroneously stated that the September 2, 2003 office note was the only examination of Rose in the file.  But Blumberg's review did afford Rose an opportunity to supplement the record with objective evidence of her disability.  *Id.*; *see also Wilkins*, 150 F.3d at 616.

Ennis, an independent orthopedist, did review the entirety of Rose's file.  In his peer review, Ennis referred to and relied upon numerous office visit notations, examination notes, work capacity forms, and test results.  (AR 0552-0557).  He noted that Stover had not imposed any specific restrictions on Rose's ability to lift weights or to conduct activities below shoulder level.  *Id.* Ennis further commented that Stover had not placed any restriction on Rose regarding rotating her shoulder.  *Id.*  Ennis stated that Rose continued to experience shoulder pain and that her shoulder remained tender.  *Id.*  Ennis also noted that she had excellent motion in all planes. *Id.*  He concluded that Rose could perform her job with restrictions with the qualification that if

19

her job required overhead lifting, she would not be capable of returning to that job after November 8, 2003.  (AR 0552-0555).

Subsequently Ennis received Rose's job description.  (AR 0556-0557).  After reviewing that document and his previous review, Ennis concluded that because her job did not require her to do any overhead pushing, pulling, carrying, or lifting, she was capable of returning to her job. *Id.*

Ennis' reviews described the data he analyzed in reaching his conclusions.  (AR 0552-0557).  Ennis mentioned x-rays, MRIs, surgery reports, and physical therapist notations as well as several of Stover's examinations of Rose in his review.  *Id.*  After completing his review, Ennis reached the same result that Stover did–Rose could work with restrictions.  *Id*; see also AR 0097.  Overall, the Court holds that Ennis offered thorough, reasoned explanations for his conclusions that were based on the administrative record.

In addition to Blumberg and Ennis, the appeal committee, which included another physician, reviewed Rose's entire file.  (AR 0325, 0326).  That review lead the appeals committee to conclude that the information Rose had submitted failed to support a finding of disability.  The appeals committee's February 13, 2004 letter to Rose informing her of its decision to deny benefits specifically referenced numerous documents the committee had considered in reaching its determination.

After a thorough review of the record, the Court concludes that Broadspire's ultimate decision to deny Rose's application was not arbitrary and capricious.  Two independent orthopedists reviewed Rose's file.  Each prepared reports that relied on and made reference to the administrative record.  Ennis considered what Blumberg had not considered and Ennis'

20

report provided reasons for his conclusions.  Moreover, the appeals committee, one member of which was a physician, conducted its own analysis of the record.   An adequate and alterative ground therefore exists that supports Broadspire's decision to deny Rose's application for long-term disability benefits.  *Kalish*, 419 F.3d at 507.  Thus, the Court concludes that Broadspire's decision was not arbitrary and capricious.

## CONCLUSION

Broadspire's motion for judgment on the record is **GRANTED**.  (Doc. # 17).  Rose's motion for judgment on the record is **DENIED**. (Doc. # 16).

**IT IS SO ORDERED.**


    /s/   Gregory L. Frost                          
**GREGORY L. FROST**
**UNITED STATES DISTRICT COURT**